1    IN THE UNITED STATES DISTRICT COURT
     FOR THE DISTRICT OF COLORADO
2

Criminal Action No. 03-CR-23
3

UNITED STATES OF AMERICA,
4

     Plaintiff,
5

vs.
6

SCOTT LEE KIMBALL,
7

     Defendant.
8

_____
9

**SEALED REPORTER'S TRANSCRIPT**
10                    (Sentencing Hearing)

11
_____

12          Proceedings before the HONORABLE MARCIA S. KRIEGER,

13   Judge, United States District Court for the District of

14   Colorado, commencing at 11:10 a.m., on the 1st day of December,

15   2003, in Courtroom 12, United States Courthouse, Denver,

16   Colorado.

17                         **APPEARANCES**

18          JOSEPH URBANIAK, Assistant U.S. Attorney, 1225 17th

19   Street, Suite 700, Denver, Colorado, 80202, appearing for the

20   plaintiff.

21          KENNETH EICHNER, Attorney at Law, 1776 Lincoln Street,

22   Suite 1010, Denver, Colorado, 80203, appearing for the

23   defendant.

24    Proceeding Recorded by Mechanical Stenography, Transcription
       Produced via Computer by Paul Zuckerman, 1929 Stout Street,
25        P.O. Box 3563, Denver, Colorado, 80294, (303) 629-9285

1          (In open court at 11:10 a.m.)

2               THE COURT:  Please be seated.

3               Good afternoon -- good morning.  It only feels like

4     afternoon.

5               We're convened this morning in Case No. 03-CR-023.

6     This is encaptioned the United States of America vs. Scott Lee

7     Kimball.  The matter has been set down for sentencing,

8     continued from September 29, 2003.  Could I have entries of

9     appearance, please.

10              MR. URBANIAK:  Good morning, your Honor.  Joseph T.

11    Urbaniak, Jr., Assistant United States Attorney, appearing on

12    behalf of the Government.

13              THE COURT:  Thank you.

14              MR. EICHNER:  Good morning, your Honor.  Kenneth

15    Eichner of the Eichner Law Firm on behalf of Mr. Kimball, who

16    is present today.

17              THE COURT:  Thank you.

18              This matter is before the Court for purposes of

19    imposing sentence.

20              The record reflects that on February 27, 2002, a

21    two-count indictment -- sorry -- a two-count information was

22    filed in the District of Alaska, charging the defendant in

23    Counts 1 and 2 with making, uttering, and possessing a

24    counterfeited security in violation of 18 U.S.C. Section

25    513(a).  Pursuant to Rule 20, on December 18, 2002, the matter

1   was transferred to the District of Colorado and ultimately

2   assigned this case number.

3          On March 10, 2003, the defendant pleaded guilty to

4   Counts 1 and 2 of the information.   The plea agreement provides

5   for the Government to not prosecute the defendant for any other

6   offenses presently known to the Government or for any offenses

7   based upon information provided by the defendant in accordance

8   with Sentencing Guideline Section 1B1.8.   Assuming the

9   defendant would continue to cooperate with the Government, the

10   plea agreement anticipated that the Government would file a

11   motion for downward departure in accordance with sentencing

12   guideline section 5K1.1 and recommend the defendant be

13   sentenced at the low -- lowest end of the applicable guideline

14   range.

15          The defendant has been released on his personal

16   recognizance since December 18, 2002.   According to the

17   presentence report, prior to that time, he was incarcerated in

18   pretrial detention between November 7, 2001, and December 18,

19   2002, which is a total of 412 days.

20          Mr. Eichner, would you and your client please approach

21   the lectern.

22          A motion to seal these proceedings and the resulting

23   judgment has been filed and the Court has granted the motion.

24   As a consequence, this courtroom has been sealed.   And I'd like

25   to find out from counsel what their position is with regard to

1    the resulting judgment.

2          *MR. URBANIAK:*  I don't have a problem with the

3    resulting judgment.  As a matter of fact, your Honor,

4    Mr. Kimball has information and will possibly testify in

5    another case here.  And for that reason, I will probably be

6    moving to ask the Court to release some of that for that

7    particular purpose in the case before Judge Daniel.

8          *THE COURT:*  So I'm confused.  You say you have no

9    problem with that.  You have no problem with the sealing of the

10   judgment, or no problem with the not sealing of the judgment?

11   What is the Government's position with regard --

12         *MR. URBANIAK:*  No problem with the not sealing the

13   judgment.

14         *THE COURT:*  All right.  Mr. Eichner?

15         *MR. EICHNER:*  The Court's indulgence.

16       (Discussion off the record between Mr. Eichner and

17   defendant.)

18         *MR. EICHNER:*  We're in accord with the Government,

19   your Honor.  We have no problem with the resulting judgment,

20   assuming the rest is sealed.

21         *THE COURT:*  What do you mean "the rest"?

22         *MR. EICHNER:*  Well, the --

23         *THE COURT:*  The judgment document states the sentence;

24   and attached to the judgment document is a transcript of this

25   court's findings and conclusions which are incorporated therein

1   by reference.  Now, what is it that you want to have sealed or

2   not sealed?

3          MR. EICHNER:  Well, the -- we would ask that the

4   accompanying document be sealed because in the Court's findings

5   there might be reference to some of the things the defendant

6   has done.

7          THE COURT:  All right.  I don't think that's going to

8   be the case; but notwithstanding that, what we will do is you

9   can file a written motion for sealing of whatever part of the

10  judgment you want once you've read it.  I'm not going to

11  anticipatorily seal the judgment or the transcript of the

12  findings with regard to that.

13         MR. EICHNER:  Very well, your Honor.  Okay.

14         THE COURT:  The Court has received and reviewed a

15  presentence investigation report dated September 17, 2003; an

16  addendum dated September 17, 2003, and an addendum dated

17  December 1, 2003.

18         Let me ask you, counsel:  Have you and the defendant

19  had adequate opportunity to review and consider the presentence

20  investigation report and accompanying addenda?

21         MR. URBANIAK:  Yes, your Honor.

22         MR. EICHNER:  Yes, your Honor.

23         THE COURT:  Care to make any argument with regard to

24  factual or legal issues in dispute with regard to the

25  presentence report?

1          *MR. EICHNER:*  I do, your Honor.  May I proceed?

2          *THE COURT:*  Please.

3          *MR. EICHNER:*  Thank you.  In the most recent second

4    addendum to the presentence report dated December 1, on No. 1

5    we are in agreement with Mr. Merlo.  There was, in fact, a

6    typo.

7          No. 2, relocation of the offense, we outlined our

8    position in the filing called "Objections to Addendum to the

9    Presentence Investigative Report," and we still -- we still

10   respectfully dissent with probation's position.  There was no

11   relocation of offense or any sophisticated means.  In this

12   instant case, there were two checks.  Mr. Kimball worked in

13   Alaska, and the fishing company happened to reside in Seattle,

14   Washington.  And it's our position that there was no relocation

15   of offense.

16         On No. 3, the criminal history, we are in agreement

17   finally with probation that it is category IV, not V; and the

18   appropriate range before this honorable court is 15 to 20

19   months -- 21 months.

20         The -- on No. 5, mental health treatment, Mr. Kimball

21   is treated for emotional matters by Dr. Karen Kelly, and it's

22   our position that that's not needed.  He is aware of some of

23   the stresses he deals with in working with the Government and

24   other issues that he's dealt with in the past, and he is

25   treating them appropriately.

1          The other thing I wanted to address before this court

2    is the departure that the Government has recommended.

3          THE COURT:  I'm not dealing with that.  I'm dealing

4    solely with the presentence are report; and if I understand

5    your position correctly it's slightly different than what you

6    just stated.  With regard to the relocating, which is, I

7    suppose, a term of art, what we're really talking about here is

8    a sophisticated means to facilitate an offense.  Your position

9    is that the offense level should not be 12; it should stay at

10   10.  Is that correct?

11         MR. EICHNER:  Well, the Court's indulgence.

12         Your Honor, Mr. Merlo has convinced me that that was a

13   mistake that Mr. Urbaniak and I made and that the correct

14   offense level is 12.  If the Court sees it otherwise --

15         THE COURT:  Well, Counsel, the way I read this is that

16   the adjusted offense level becomes 12 by virtue of a two-level

17   increase.

18         MR. EICHNER:  Then I apologize.  I misunderstood him.

19   I am not --

20         THE COURT:  Am I missing something here, folks?

21         MR. EICHNER:  No.  I am not stipulating to the two

22   level increase based on relocation.  I thought that it was

23   independent.  So the answer is no, I think it should be a base

24   level of 10 because I don't think the relocation -- there was

25   relocation, and I outlined that in my motion.

1          THE COURT:  All right.  Let me hear from Mr. Urbaniak,

2    please.

3          MR. URBANIAK:  I'm in agreement with Mr. Merlo, your

4    Honor, on his calculations and findings.

5          THE COURT:  All right.  Well, then I have to ask

6    Mr. Merlo, because I think we have some confusion here.  And

7    maybe it's in the ordering of the analysis, but I'm not

8    reading -- I'm not doing the calculations the same way you all

9    are.

10          It looks like to me the parties are in agreement that

11    the base offense level here is 6.

12          THE PROBATION OFFICER:  Yes, that would be correct.

13          THE COURT:  Is that correct?

14          THE PROBATION OFFICER:  Yes, your Honor, that is

15    correct.

16          THE COURT:  And then there is a two-level increase

17    because of the amount involved.  That's pursuant to

18    Section2B1.1, so that takes us up to 8.  Is that correct?

19          THE PROBATION OFFICER:  That's correct.

20          THE COURT:  All right.  Now, under Section

21    2B1.1(b)(8), if there was sophisticated means used, you

22    increase by two levels, which would take us to 10; but if the

23    resulting offense level is less than level 12, it goes to 12.

24          THE PROBATION OFFICER:  That is correct, your Honor.

25          THE COURT:  Is that right?

1          All right.  Then there are no victim or role,

2    obstruction adjustments, so you have an adjusted offense level

3    of 12; but because there has been an acceptance of

4    responsibility, it drops to 10.  Right?

5          THE PROBATION OFFICER:  Yes, your Honor, that is

6    correct.

7          THE COURT:  All right.  Now, the defendant here

8    contests whether sophisticated means were used.  If the Court

9    were to determine that sophisticated means were not used, we

10   would have a base level of 6, increased to 8, and then

11   decreased by 2.

12         THE PROBATION OFFICER:  Yes, your Honor, that's

13   correct.

14         THE COURT:  So we would then have an offense level of

15   6.

16         THE PROBATION OFFICER:  Yes, your Honor.

17         THE COURT:  Right?

18         THE PROBATION OFFICER:  Yes, your Honor.  That's

19   correct.

20         THE COURT:  All right.  And what is the imprisonment

21   range at 6 with a criminal history category of IV?

22         THE PROBATION OFFICER:  Yes, your Honor.  The criminal

23   history category of IV, the guideline range of imprisonment

24   would be 6 to 12 months.

25         THE COURT:  And the fine range?

1    *THE PROBATION OFFICER:*  Fine range, your Honor, would

2    be -- if the Court will bear with me one moment -- the fine

3    range total offense level of 6 would be $500 to $5,000.

4            *THE COURT:*  With the two offenses combined together;

5    right?

6            *THE PROBATION OFFICER:*  When you say the two offenses,

7    your Honor --

8            *THE COURT:*  They're placed into a one count group;

9    right?

10           *THE PROBATION OFFICER:*  Yes, your Honor.

11           *THE COURT:*  So you combine the two offenses for

12   purposes of the fine; right?

13           *THE PROBATION OFFICER:*  Yes, your Honor.

14           *THE COURT:*  Okay.  And what is the supervised release

15   time period at 6 with a category of IV?

16           *THE PROBATION OFFICER:*  That would still be two to

17   three years, your Honor --

18           *THE COURT:*  Okay.

19           *THE PROBATION OFFICER:*  -- for each count.

20           *THE COURT:*  Okay.  Now, I assume, Mr. Eichner, that's

21   what you're arguing for.  Is that right?

22           *MR. EICHNER:*  You are correct, your Honor.  Thank you.

23           *THE COURT:*  Now, Mr. Urbaniak, let me hear your

24   argument to the contrary now that we've got the two options

25   laid out.

1    *MR. URBANIAK:*  I'm in agreement with Mr. Merlo, your

2    Honor, just in general.  I think he knows more about this

3    particular situation than I do, and I'm persuaded by what he's

4    told the Court.

5        *THE COURT:*  All right.  We have a factual issue,

6    folks.  The factual issue is whether or not the offense

7    involved sophisticated means.  Are you prepared to present

8    evidence?

9        *MR. EICHNER:*  Are you talking to me, or Mr. Urbaniak?

10       *THE COURT:*  Both of you.

11       *MR. EICHNER:*  Well, your Honor, it's -- I don't have

12   additional evidence.  I outlined what I know the facts to be in

13   my motion.  I have no other additional --

14       *THE COURT:*  Do you care to make an offer of proof,

15   Counsel?

16       *MR. EICHNER:*  I do.

17       *THE COURT:*  Do so.

18       *MR. EICHNER:*  My offer of proof is that Mr. Kimball

19   did not relocate the checks.  The checks were from a business

20   he worked at in Seattle, Washington.  It was a fishing

21   business.  He was based in Alaska, and there was an account

22   with Wells Fargo Bank in Alaska.  The offense happened in

23   Alaska, and Mr. Kimball deposited the checks into his Alaska

24   account.

25       As a technical matter, checks were drawn on a business

1  account at the Wells Fargo branch in Seattle, but that's just

2  because the fishing company had its headquarters in Seattle.

3  There are no relevant facts or events which shows a

4  sophisticated methodology or plan to avoid detection by

5  crossing state lines.

6      Thank you.

7      *THE COURT:*  All right.  Mr. Urbaniak, what would your

8  offer of proof be?

9      *MR. URBANIAK:*  That, and added to it the checks were

10  deposited into the account in Alaska under a false name, Bret

11  Kimball.

12      *THE COURT:*  All right.  With regard to the presentence

13  report, the only material dispute is as to the applicability of

14  the specific offense characteristic found at Section

15  2B1.1(b)(8)(C), which raises the issue of whether the defendant

16  used sophisticated means to facilitate the offense.  Here,

17  there were two counterfeited checks drawn on the business

18  account for the business that employed the defendant, and the

19  defendant deposited these to his personal account.

20      The definition of "sophisticated means" under Section

21  2B1.1(b)(8)(C) means "especially complex or especially

22  intricate offense conduct pertaining to the execution or

23  concealment of an offense."  And the examples that are given

24  are, say, in a telemarketing scheme locating the office -- the

25  main office of the scheme in one jurisdiction but soliciting

1    operations in other jurisdictions.  Conduct in hiding assets or

2    transactions through the use of fictitious entities, corporate

3    shells, or offshore financial accounts also indicate

4    sophisticated means.

5         Here, the Court cannot conclude that the drawing of

6    the check on the Washington bank account was a sophisticated

7    means involving two jurisdictions.  The reason is there is no

8    evidence that the defendant opened the Washington account.

9    That was simply the account that the business used in

10   Washington, not anything that Mr. Kimball had anything to do

11   with.

12        Now, he definitely used a false name on the fraudulent

13   checks and he deposited them to his account; but those

14   particular aspects are covered by the charges to which he has

15   pled guilty and do not reflect in my view especially intricate

16   offense conduct regarding the execution or the concealment of

17   the offense.  In fact, it's rather hard to believe that one

18   could fraudulently obtain and deposited -- deposit such checks

19   in a manner other than the manner used by the defendant.

20        Thus, I conclude that the enhancement provided by

21   Section 2B1.1(b)(8) pertaining to a sophisticated means is not

22   applicable in this context because there was no especially

23   complex or intricate offense conduct, especially involving more

24   than one jurisdiction.

25        I thus conclude that the enhancement of four levels

1  from level 8 to level 12 is not appropriate under the

2  circumstances.

3          There appears to be no other dispute with regard to

4  the presentence report that has not been addressed in the

5  addendum, except the defendant objects to participation in

6  mental health counseling as a condition of supervision.  But

7  that's not based on a factual dispute.

8          All right.  Let's move to motions for departure.

9  Mr. Urbaniak?

10          *MR. URBANIAK:*  Your Honor, I filed a motion for

11  downward departure asking the Court to make a downward

12  departure which reflects a 50 percent reduction from the lowest

13  end of the applicable sentencing range, whatever that is; and

14  we've determined what it is now.  And it's based on

15  Mr. Kimball's cooperation in three areas, the first of which,

16  Mr. Kimball came to my attention when an FBI agent through

17  other FBI agents said that while Mr. Kimball was down here

18  incarcerated or being detained, you know, many, many months

19  ago, he was with another person in the jail.  And that person's

20  name was Steven Ennis.  Steven Ennis is charged in another case

21  that's before this court, particularly Judge Wiley Daniel; and

22  he's charged with drug trafficking.  Mr. Kimball reported to

23  agents that Mr. Ennis told him or asked him, and they discussed

24  killing two witnesses, the two witnesses that Mr. Ennis thought

25  were the main witnesses in the case and, in fact, the witnesses

1  that did make the case against him.  Since I'm handling the

2  other case, I know the names; and they are indeed the two

3  people that do make the case against Mr. Ennis.

4        I believe that Mr. Kimball's information was

5  corroborated when he turned over to the FBI agent certain

6  documents that he said that he had received from Mr. Ennis.

7  They're photographs, a couple of photographs of one person by

8  the name of Genaro Briganti [phonetic], who lives in New York.

9  Also, there was a sheet of paper that had Mr. Briganti's work

10 address and his residence address.  And then in addition to

11 that, there was a name given of the other person, whose name is

12 Edward Gleason.  That person's whereabouts were unknown at the

13 time; but he was one of the two people pointed out by Mr. Ennis

14 to Mr. Kimball as people that they discussed harming or killing

15 or otherwise prevent testifying against him.

16        I know that while he was in the District of Alaska,

17 where he was eventually moved, he came up with some information

18 to the FBI about a plot to kill a federal judge and a federal

19 prosecutor in Alaska.  The two people -- I believe there were

20 two people who were charged with that.  They initially pled

21 guilty, as I understand it, were allowed to withdraw their

22 pleas of guilty.  They later went to trial; and although not

23 convicted of the main charge -- that is, conspiracy to kill a

24 federal judge and federal prosecutor and whatever substantive

25 charges go along with that -- they were convicted of tampering

1  with a witness.  From what I'm able to determine from talking

2  to an FBI agent and other persons, their sentence was

3  aggravated because the judge said, Based on the evidence that

4  I've heard, I think you wanted to have these people killed.

5  And I'm told that it went up to 100 months at least with

6  respect to one person but quite an enhanced sentence.

7         So I think that information that Mr. Kimball gave was

8  in large part in my mind corroborated to a degree when the two

9  persons who were initially charged with it entered pleas of

10  guilty and then were later allowed to withdraw their pleas of

11  guilty.  So at one point in time, they had indicated that

12  they -- they did, indeed, plan to do what they were accused of.

13         The other area, the third area:  Mr. Kimball has been

14  cooperating with the FBI here in the District of Colorado about

15  the disappearance of a woman named Jennifer Markham.

16  Mr. Kimball has indicated that a person who is also charged in

17  a case before Judge Daniel had -- and who is known to law

18  enforcement to be the drug partner of the other person,

19  Mr. Ennis, had told him, Mr. Kimball, that he had this woman

20  killed.  You know -- and it hadn't been corroborated or

21  whatever; but the FBI agent with whom I've spoken, who is here

22  today, actually believes in the case, so to speak, and believes

23  Mr. Kimball.

24         You know, in light of Mr. Kimball's background and

25  number of convictions, I have to remain a little skeptical

1    unless something is corroborated.  And I've told your Honor

2    that I believe the first two areas are corroborated, and the

3    agent knows more about this -- this third area than I do.  And

4    just because he's a very experienced agent, he believes

5    Mr. Kimball when Mr. Kimball tells him that did he meet with

6    someone who told him that he had had a woman killed or killed

7    her and then removed and hid her body.

8           There has been some corroboration of that in this

9    sense, in that the woman always lived here, she was married

10   with a child.  She got divorced.  And although she was in a,

11   you know, sort of a flighty kind of lifestyle -- she was a

12   prostitute and that -- no one has heard or seen her since this

13   came about for many, many months.  And as more time goes by,

14   there is indeed the feeling that something did happen to her,

15   because she used to contact her former husband because they

16   have a child together.

17          But that's -- those are the three areas in which he's

18   cooperated and actually testified -- I neglected to mention

19   this -- at the trial in Alaska that resulted in the

20   convictions.

21          *THE COURT:*  Mr. Urbaniak, I'm curious as to why the

22   Government is seeking a downward departure here, given the fact

23   that the sentencing range is six to 12 months.  And if, indeed,

24   this defendant is given credit for presentence confinement --

25   he's been confined for 412 days already, so it would make

 1   absolutely zero difference whether there is a downward

 2   departure or not because he has already served the amount of

 3   time that could be imposed as a sentence.

 4        MR. URBANIAK:  That's apparent today, your Honor;

 5   that, you know, based on everything in our recalculation, there

 6   is no danger of him having to spend any additional time.  So

 7   certainly there is no real effect to the motion for downward

 8   departure.

 9        THE COURT:  What's your position, Counsel, with regard

10   to the level of the defendant's cooperation in supplying

11   financial information for preparation of the presentence

12   report?  Looks like there has been a lot of cooperation in

13   supplying information about other folks but not so much

14   cooperation in supplying financial information to the probation

15   department.

16        MR. URBANIAK:  In general would be -- it appears there

17   is some difficulty in that area.

18        THE COURT:  And how does that bear upon your motion

19   for downward departure?

20        MR. URBANIAK:  Would certainly temper it in the sense

21   of if the Court is inclined to grant it at all then it probably

22   would undermine a 50 percent downward departure.  But as the

23   Court has pointed out, I believe it's somewhat academic.

24        THE COURT:  All right.  Mr. Eichner?

25        MR. EICHNER:  Well, everything Mr. Urbaniak is saying

1    is true.  He did participate in all these things.  And quite

2    frankly he was very nervous about his undercover work here.

3    And he is -- Your Honor is absolutely correct:  He is guilty of

4    not being as cooperative as he should have been with Probation,

5    and I've taken him to task on that and told him you were going

6    to raise that very issue.

7          But in addition to testifying in the Alaska case, some

8    of the things he's also done locally is he supplied information

9    to the FBI on a federal parole violater; a federal prison plan

10   to escape; drug-dealing information that was turned over to the

11   West Metro Area Task Force; an arson in Montana, and at one

12   point in time, there was a threat on his life and the FBI had

13   to move him.  And he was very nervous about giving any

14   information -- and a lot of those documents contain

15   addresses -- to anyone.  He was quite frankly scared.  And --

16         THE COURT:  And he's been taken care of by the

17   Government thus far, hasn't he, financially?

18         MR. EICHNER:  You're absolutely right, your Honor.

19   Initially he was in fact paid by the FBI.  And right now,

20   he's -- he has started a company, a general contracting

21   company; and he hopes when his services with the FBI, in

22   helping them, as that wanes, he will be able to grow this

23   company.

24         THE COURT:  How much money has he received from the

25   FBI?

1          *MR. EICHNER:*  The Court's indulgence.

2          Approximately 20,000, your Honor.

3          *THE COURT:*  Now, this isn't the same 20,000 that is

4    currently being held.

5          *MR. EICHNER:*  Absolutely not.

6          *THE COURT:*  Okay.  And what's your position with

7    regard to the downward departure and why the Court should

8    consider it in light of the fact that this sentencing range is

9    going to be covered by the pre--- the amount of time that's

10   already been spent in pretrial detention?

11         *MR. EICHNER:*  We were -- It was the intention of the

12   parties all along to keep working for the departure because the

13   criminal history -- and there was some debate about the amount

14   of months, and obviously it's my job, and out of an abundance

15   of caution --

16         *THE COURT:*  I understand where you were.  I want to

17   know where you are now.

18         *MR. EICHNER:*  I'm not going to lie to the Court.  I've

19   never been in an instance like this.  My gut reaction, which

20   might not intellectually be the correct answer, is I'd like to

21   go ahead and get that departure.  But I honestly have never

22   been in a situation like here, where the departure bested or

23   when -- went below what he was facing.

24         *THE COURT:*  Well, what's your legal position?

25         *MR. EICHNER:*  My legal position is I'd like the

1    departure.  He worked for it.  He earned --

2         THE COURT:  I understand you'd like the departure; but

3    what you're really saying is (1) you've not encountered this

4    situation before and you don't have a well-informed legal

5    position.  That's what you've told me.  (2) Although you'd like

6    this departure, you recognize, the same as Mr. Urbaniak and I

7    do, that the time already spent in pretrial detention is going

8    to eat up any sentence that's going to be applied here.

9         Now, we have one of two options.  I can either rule on

10   this motion, or you can ask for a continuance to do some

11   research.  What is it you want to do, Mr. Eichner?

12        MR. EICHNER:  The Court's indulgence.

13      (Discussion off the record between Mr. Eichner and

14   defendant.)

15        MR. EICHNER:  Your Honor, after consulting with my

16   client, we'd like to proceed today and have the Court rule on

17   the motion.

18        THE COURT:  All right.  What further argument do you

19   want to make with regard to the motion for downward departure?

20        MR. EICHNER:  I just want to -- I know Mr. Kimball has

21   a high criminal history category and the -- we feel he's earned

22   the departure.  And as the Court probably recognized, you know,

23   just historically after 9-11, everyone sort of realized

24   without, you know, people having a criminal record and being

25   able to infiltrate criminal activity, there is no good

1   preemptive law enforcement information, either domestic or

2   international.  And you know, although he does have a -- he

3   committed an offense and while already having a record, we'd

4   ask that the Court grant the departure based on all of the

5   activities he's participated in.

6          THE COURT:  All right.  Any further argument,

7   Mr. Urbaniak?

8          MR. URBANIAK:  No, your Honor.  Thank you.

9          THE COURT:  All right.  We'll move to allocution, and

10  I'll rule on the motion for departure at the time I announce

11  the sentence.  Mr. Eichner?  Allocution.

12         MR. EICHNER:  Well, the Court has read the PSI and the

13  addendums and has a general idea of what Mr. Kimball is about.

14  And I don't want to be redundant.  I stated the importance of

15  what he did to counteract some of the negative as effects of

16  his history.

17         In the -- in the report, it's mentioned that he --

18  there has been a lack of cooperation, and they've always asked

19  for a higher sentence for punishment deterrence and the

20  protection of the public.

21         However, in terms of punishment, he has, as the Court

22  recognized, spent 412 days, or 13.7 months incarcerated.  And

23  in terms of deterrence, he knows because of his record that,

24  you know, one false move while on parole will be disastrous for

25  him.  And in terms of protection of the public, he has been

1    proactive to make an effort, you know, to actually do some

2    public service, if you will, by working with the Bureau.  And

3    yes, a lot of it might be labeled as self-serving to help him,

4    but there is a big difference between writing some bad checks

5    and, you know, a plot to kill a federal judge.  He didn't want

6    any part of that and he saw an opportunity to stop it, and he

7    did.

8         And I hope the Court balances that with not supplying

9    everything that probation requested.

10        The only other thing I would ask actually goes to the

11   fines.  We agree with probation's analysis that 8287.95 is owed

12   to Wells Fargo, and we would ask the Court for a judgment or

13   order that we can send it in.  Once they get that, Wells Fargo

14   will be paid immediately and they will be made whole.

15        That's really everything I have to say, your Honor.

16   Thank you so much.

17        *THE COURT:*  Thank you.  Mr. Kimball?

18        *THE DEFENDANT:*  Your Honor, I would just like to

19   address the Court that I haven't had a -- I would say, you

20   know, a real responsible past.  I've been deceitful and I've

21   had many things based on lies.  But as Mr. Eichner pointed out,

22   when it came down to, you know, the threatening of a judge and

23   a prosecutor, that was -- that -- even a check-writer has, I

24   guess you'd say, morals or, you know, things that he won't do

25   or won't partake in.  And I just did what I thought was best at

 1   the time in contacting the authorities to let them know what --

 2   what was happening.  Whatever they could make of it, you know,

 3   that would be up to them; but I didn't want anything over me

 4   that I could have done something or could have prevented

 5   something in any of the cases, not just the judge case but with

 6   the Jennifer Markham and the Steven Ennis and the Genaro

 7   Briganti.

 8          So I've got some positive things going on in my life.

 9   I've been out on the streets almost a year now.  I've been

10   married for three months.  I have two children that I'm very

11   active in their lives, and it's good to be back where I need to

12   be.

13          THE COURT:  Mr. Kimball, why haven't you supplied full

14   information to the probation department for preparation of the

15   presentence report?

16          THE DEFENDANT:  I apologize to Mr. Merlo.  I was not

17   trying to be stubborn or trying to be difficult.  I just

18   didn't -- just have been a little bit very fearful that any

19   information about me or my whereabouts could leak out.  I know

20   that it's very easy for someone to contact the probation

21   officer and portray themselves as another law enforcement

22   officer, and they get a secretary on the phone and they say,

23   I'm looking for Mr. Kimball.  I'm Sergeant So-and-so with the

24   Denver Police.  Do you have a current address for him?  And

25   it's very likely, and many times that that information is given

1   out.  The probation department would like to think that the

2   information is secure, but it's not; and I'm very paranoid that

3   something will happen to my family and myself.

4           THE COURT:  So in short, you will accommodate and

5   cooperate with law enforcement when it benefits you but not

6   when you fear that it won't.  Is that correct?

7           THE DEFENDANT:  No, your Honor, that's not correct.

8   When I cooperate with law enforcement, that also puts me in

9   jeopardy as well; but I feel that the integrity of the Bureau

10  as that they're also trying to make a case, so it benefits them

11  to keep the information private.

12          THE COURT:  Thank you.

13          THE DEFENDANT:  Thank you, your Honor.

14          THE COURT:  Mr. Urbaniak?

15          MR. URBANIAK:  I don't have anything to say, your

16  Honor.

17          THE COURT:  Thank you.

18          The Court will announce the sentence it intends to

19  impose at this time; but, Counsel, you will have a final chance

20  to make any legal objections that you care to before I actually

21  impose the sentence.

22          We begin with the presentence report; and as I have

23  previously noted in the record, no finding is necessary as to

24  dispute between the Government or the defense with regard to

25  that report except as to the applicability of the enhancement

1   provided by Section 2B1.1(b)(8) pertaining to an upward

2   adjustment.  And the Court has previously received an offer of

3   proof with regard to that by both the defense and the

4   prosecution and concluded based upon application of the

5   definition of "sophisticated means" that the upward enhancement

6   is not applicable in these circumstances.

7         With regard to all other aspects of the presentence

8   report, it does not appear that any further findings are

9   required; and the Court adopts the report with its various

10   addenda as the Court's findings.

11         Based on that report and the representations made

12   today, the Court finds that the Sentencing Commission guideline

13   applicable to the counts in the information to which the

14   defendant has pled guilty is Section 2B1.1; and pursuant to

15   Section 3D1.2(d), Counts 1 and 2 are placed in a one-count

16   group.

17         The guideline for violation of 18 U.S.C. Section

18   513(a) is Section 2B1.1 with a base offense level of 6.

19   Because the amount involved in the fraudulent checks was more

20   than $5,000 but less than $10,000, Section 2B1.1(b)(1)(B)

21   provides for a two-level increase.

22         In this case, the loss was $8,287.95; and the parties

23   agree that that sum is currently being held by the Cordova

24   Police Department in Cordova, Alaska.

25         There are no victim, role, or obstruction adjustments;

1  and the Court has declined to make an upward adjustment in

2  accordance with Section 2B1.1(b)(1)(B).  Therefore, the

3  adjusted offense level is 8.  Actually, the declination that I

4  made was not 2B1.1(b)(1)(B) but 2B1.1(b)(8).

5          The defendant has accepted responsibility for his

6  conduct; and therefore, pursuant to section 3E1.1(a), the

7  offense level is reduced by two levels.  This results in a

8  total offense level of 6.

9          The defendant's criminal history category is IV; and

10  in accordance with the guidelines, this results in an

11  imprisonment range of 6 to 12 months, a fine range of 500 to

12  $5,000 and a supervised release range of two to three years for

13  each of Counts 1 and 2.

14          The Government has filed a motion for downward

15  departure in accordance with section 5K1.1 and points to at

16  least three instances in which the defendant has provided

17  substantial assistance in the investigation or prosecution of

18  another person who has committed an offense.  These include

19  information with regard to charges brought against individuals

20  in Alaska and also here in Colorado.

21          The Court is troubled with regard to this motion that

22  the defendant seeks a downward departure based upon his acts in

23  revealing information about other people but his blatant

24  unwillingness to reveal information about his own financial

25  affairs in preparation of the presentence report.  And the

1    Court is further troubled that his current financial

2    circumstances about which he will not disclose information

3    pertain to the fact that he has received substantial funds from

4    the FBI in assisting the Government with regard to all of these

5    actions.

6            This behavior smacks of an attitude of "I will do what

7    benefits me but I have no obligation to be forthcoming in

8    information that the Court requires in order to impose my

9    sentence."  In other words, "I'm happy to turn other people in,

10    but I don't want to be held fully accountable for my own

11    behavior."

12            There is no exception that I am aware of under section

13    5K1.1 for refusing a downward departure where there has been

14    substantial assistance, even under these circumstances.  And

15    therefore, the Court grants the motion for a downward departure

16    as requested by the Government because an appropriate showing

17    has been made.

18            That will reduce the period of incarceration from a

19    range of 6 to 12 months to 3 months, which means that the

20    defendant will serve no time because his presentence

21    incarceration or detention in Alaska exceeds the three-month

22    period.

23            But in light of the fact that Mr. Kimball is

24    disinclined to reveal the information that is required for

25    adequate evaluation of the appropriate sentence and in light of

1  the fact that Mr. Kimball has funds in the sum of $20,000 that

2  are being held by third parties and in light of the fact that

3  he has received $20,000 from the FBI for assistance in his

4  living expenses over the past months, the Court will impose the

5  maximum fine to be paid immediately upon release of the funds

6  by the third party.

7       The Court intends to impose an incarceration period

8  consistent with granting the Government's motion of six months;

9  to impose a fine in the amount of $5,000, to be paid

10  immediately upon the release of the $20,000 from the party

11  holding the $20,000; to impose a restitution obligation to be

12  paid from said funds in the amount of $8,287.94, to be paid

13  directly to Wells Fargo, and to further impose a supervised

14  release period of three years subject to the standard

15  conditions imposed by the Court with a special condition that

16  the defendant continue in his current course of mental health

17  treatment until released by the treating physician.

18       The Court will authorize the probation officer to

19  release psychological reports and the presentence report to the

20  treating professional, but the probation officer shall have no

21  role in determining the length, scope, or duration of the

22  treatment.

23       The Court also declines to waive interest on the fine

24  and is required to impose a mandatory assessment of $100.  I

25  believe it's on each count.

1    THE PROBATION OFFICER:  Yes.  That's correct, your

2    Honor.

3    THE COURT:  So a total sum of $200 to be paid

4    immediately.

5    In evaluating what sentence is appropriate under these

6    circumstances, the Court has taken into account the seriousness

7    of the offense and attempted to tailor a sentence that promotes

8    respect for law, not only the law that the defendant wants to

9    comply with but all the laws; a sentence that provides just

10   punishment, affords adequate deterrence to criminal conduct,

11   protects the public from further crimes of the defendant, and

12   provides the defendant with needed medical -- here

13   psychological -- treatment in the most effective manner.

14   Is there any further argument that counsel desire to

15   make?

16   MR. URBANIAK:  No, your Honor.

17   MR. EICHNER:  Court's indulgence.

18   (Discussion off the record between Mr. Eichner and

19   defendant.)

20   MR. EICHNER:  No other objections, your Honor.  The

21   only thing my client mentions is he wants to comply with

22   everything as fast as possible.  And would the order to the

23   court -- or excuse me -- the order to go out that we would give

24   to the police in Alaska be an order to release all the funds to

25   the Clerk of the Court so they can immediately pay these

1     things?  We just want to make sure the order is correct to take

2     care of your wishes as soon as possible.

3          THE COURT:  No.  It would not be an order directing

4     payment to the clerk of this court.  It will be an order

5     directing payment directly to Wells Fargo.

6          MR. EICHNER:  And for him to pay that $5,000 fine

7     would -- can you also put in the order to release the remaining

8     funds to Mr. Kimball to pay the fine you just ordered?

9          THE COURT:  We will -- I will direct in the judgment

10    that the remaining funds are to be released -- and we can do

11    this one of two ways.  I can have the funds, the $5,000 fine

12    paid directly to the designated recipient of the fine amount

13    from those funds, or they can be released to Mr. Kimball and he

14    can turn over the $5,000.

15          Mr. Urbaniak, what's your position?

16          MR. URBANIAK:  Probably the first option, your Honor,

17    to save Mr. Kimball some trouble and possible mischief.

18          THE COURT:  Mr. Eichner?

19          MR. EICHNER:  We would ask for the second; that all

20    remaining funds be turned over to Mr. Kimball.  He's not going

21    to get any mischief.  There is a microscope over his behavior.

22    He wouldn't do anything like that.  But it would be easier to

23    get the remaining funds to him so he can pay the $5,000 and any

24    other fines and costs.

25          THE COURT:  And is the Cordova Police Department in

1    possession of the remaining funds?

2              MR. EICHNER:  They are indeed.

3              THE COURT:  And the total of it is $20,000?

4              MR. EICHNER:  19,700 is the more accurate amount, I

5    believe.

6              MR. URBANIAK:  I didn't mean to imply that he was

7    going to do anything wrong with the money.  It's just something

8    could come up, like "all of a sudden my transportation broke

9    down," or "my wife needed an operation," or just something like

10   that, which could prevent it going --

11             MR. EICHNER:  He'll pay that money within 24 hours

12   that he receives it.

13             THE COURT:  All right.  Then when I enter the

14   judgment, what I will do is direct that the Cordova Police

15   Department release the $8,287.94 directly to Wells Fargo, the

16   remainder to be released and paid to Mr. Kimball.  And I will

17   direct that the police department within 48 hours of the

18   release of funds confirm that with the probation department and

19   within 48 hours of the release -- now, we better make it 48

20   hours after receipt of that payment, Mr. Kimball will pay the

21   fine --

22             MR. EICHNER:  Yes, your Honor.

23             THE COURT:  -- failing which that will be a breach of

24   a condition of supervised release which will require you to

25   come back before me to determine whether I send you to jail.

1          *THE DEFENDANT:*  Yes, your Honor.

2          *THE COURT:*  Any further argument?

3          *MR. URBANIAK:*  No, your Honor.

4          *MR. EICHNER:*  Nothing on behalf of the defense.  Thank

5     you, your Honor.

6          *THE COURT:*  Then pursuant to the factual findings that

7     the Court has previously made and in accordance with the

8     Sentencing Reform Act of 1984, it is the judgment of the Court

9     the defendant, Scott Lee Kimball, is hereby committed to the

10    custody of the Bureau of Prisons for a term of three months on

11    each count, to be served concurrently.  The Court notes that he

12    has previously been detained in presentence confinement 412

13    days.  The Court notes that although credit for time served is

14    determined by the Bureau of Prisons, it appears that the time

15    served exceeds by some substantial degree the term of

16    imprisonment imposed by this sentence.

17         The defendant shall be placed on supervised release

18    for a term of three years on each of Counts 1 and 2, the terms

19    to run concurrently.

20         While on supervised release, he shall not commit

21    another federal, state, or local crime; shall not illegally

22    possess any controlled substances; shall not possess a firearm

23    or destructive device, and shall comply with the standard

24    conditions adopted by this court.

25         It shall be a condition of supervised release that he

 1    pay the fine according to the terms I shall specify and that

 2    restitution be paid in accordance with the terms I shall

 3    specify.

 4          He shall refrain from the unlawful use of a controlled

 5    substance and submit to one drug test within 15 days of

 6    beginning on supervised release and at least two periodic tests

 7    thereafter, and he shall continue in his current course of

 8    mental health treatment until he is released by the treating

 9    professional.

10          The Court authorizes the probation officer to release

11    psychological reports and/or the presentence report to the

12    treating professional for continuity of treatment.

13          It is the judgment of the Court that the Cordova

14    Police Department in Cordova, Alaska, who presently hold a sum

15    of approximately $19,700, shall within 10 days of the date of

16    the judgment pay to Wells Fargo Bank of Alaska, Cordova Store,

17    Post Office Box 1250, Cordova, Alaska, 99574, the sum of

18    $8,287.94 and that at such time the Cordova Police Department

19    shall release the remaining balance of the sum currently held

20    in their possession to the defendant, Scott Lee Kimball, and

21    immediately notify, certainly no later than 48 hours after the

22    release, that said sums have been disbursed in accordance with

23    this judgment by contacting the probation officer supervising

24    Mr. Kimball.

25          We will assume that 10 days is sufficient time from

1   the disbursement by the Cordova Police Department to

2   Mr. Kimball for him to deposit and pay his fine of $5,000, and

3   that way we don't have to worry about when he precisely

4   receives the money.  So it shall be the order of this court

5   that the Court imposes a fine on Count 1 and Count 2 treated as

6   a single count -- a fine of $5,000, which is the maximum fine

7   that can be imposed here, and that this will be paid to -- is

8   it the Clerk of the Court?

9         THE PROBATION OFFICER:  Yes, your Honor.

10        THE COURT:  -- Clerk of this Court no later than 10

11   days after disbursement of funds by the Cordova Police

12   Department.

13        The fine shall bear interest, and it shall be a

14   condition of supervised release that the fine be paid in

15   accordance with this judgment.

16        In addition, the Court imposes the mandatory

17   assessment of $100 per count, which is due immediately.

18        Have I missed anything?

19        MR. URBANIAK:  Not that I can think of, your Honor.

20   Thank you.

21        THE COURT:  Mr. Eichner?

22        MR. EICHNER:  No.

23        THE COURT:  Mr. Merlo?

24        THE PROBATION OFFICER:  I believe that's fine, your

25   Honor.  Thank you.

1          *THE COURT:*  All right.  We crafted this as we went

2     along; so if there is an error, I trust that Counsel and

3     Probation Department will file an appropriate motion to amend

4     the judgment, if I've overlooked something.

5          Mr. Kimball, you are advised of your right to appeal

6     this sentence.  If you desire to appeal, a notice of appeal

7     will be filed with the Clerk of the Court within ten days after

8     the entry of judgment, or the right to appeal will be lost.  If

9     you are unable to afford an attorney for an appeal, I will

10    appoint one to represent you.  If you so request, the Clerk of

11    the Court will immediately prepare and file a notice of appeal

12    on your behalf.

13          Is there any further business to bring before the

14    Court?

15          *MR. URBANIAK:*  No, your Honor.  Thank you.

16          *MR. EICHNER:*  Nothing on behalf of the defense.

17          *THE COURT:*  All right.  Then consistent with the

18    manner in which we opened this proceeding, I'll direct

19    Mr. Zuckerman to prepare a transcript of the Court's findings

20    and judgment which ordinarily would be attached to the judgment

21    that will be entered and to provide Mr. Eichner with a copy of

22    those findings and conclusions so that he can determine whether

23    he wishes to file a motion to seal any part of the judgment.

24    That motion will be due to be filed with this court within 24

25    hours after Mr. Zuckerman's transmission of the transcript to

1    you, Mr. Eichner.

2         *MR. EICHNER:*  I understand.  We'll comply.  Thank you.

3    And I'll give Mr. Zuckerman my card to make sure he has my

4    address.

5         *THE COURT:*  All right.  Then that concludes this

6    matter and we will stand in recess.

7       (Recess at 12:17 p.m.)

8                         *   *   *   *   *

9                     **REPORTER'S CERTIFICATE**

10      I certify that the foregoing is a correct transcript from

11   the record of proceedings in the above-entitled matter.  Dated

12   at Denver, Colorado, this 5th day of May, 2008.

13

14                                    *S/Paul A. Zuckerman*
                                        Paul A. Zuckerman

15

16

17

18

19

20

21

22

23

24

25